# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

<table>
<tr><td>IN RE: MONTREAL MAINE AND<br>ATLANTIC RAILWAY, LTD.,<br><br>Debtor.</td><td>)<br>)<br>)<br>)<br>)<br>)</td><td>Civil no. 1:13-MC-00184-NT</td></tr>
</table>

## ORDER ON MOTIONS TO TRANSFER CASES
## AND MOTION TO STRIKE

Before the Court are two motions requesting that nineteen wrongful death cases[1] filed in Illinois in the wake of a disastrous train derailment in Lac Mégantic, Quebec be transferred to this Court pursuant to 28 U.S.C. §§ 157(b)(5) and 1334 as cases related to the Railway's bankruptcy. The first motion, filed by Robert J. Keach, the Chapter 11 Trustee (the "**Trustee**") for the estate of the Montreal Maine & Atlantic Railway, Ltd. (the "**Railway**" or the "**Estate**") and the second motion,

---

[1]    These are: *Real Breton o/b/o Estate of Genevieve Breton v. Rail World, Inc. et al.*, No. 13-cv-06194 (N.D. Ill), *Rejean Roy o/b/o Estate of Melissa Roy v. Rail World, Inc. et al.*, No. 13-cv-06202 (N.D. Ill), *Annick Roy o/b/o Jean-Guy Veilleux v. Rail World, Inc. et al.*, No. 13-cv-06192 (N.D. Ill), *Alexia Dumas-Chaput o/b/o Estate of Mathieu Pelletier v. Rail World, Inc. et al.*, No. 13-cv-06196 (N.D. Ill), *Karine Paquet o/b/o Estate of Robert Paquet v. Rail World, Inc. et al.*, No. 13-cv-06201 (N.D. Ill), *Joannie Proteau o/b/o Estate of Maxime Dubois v. Rail World, Inc. et al.*, No. 13-cv-06200 (N.D. Ill), *Therese Dubois Poulin o/b/o Estate of Denise Dubois v. Rail World, Inc. et al.*, No. 13-cv-06195 (N.D. Ill), *Lisette Fortin-Bolduc o/b/o Estate of Stephane Bolduc v. Rail World, Inc. et al.*, No. 13-cv-06198 (N.D. Ill), *Sandy Bedard o/b/o Estate of Michael Guertin, Jr. v. Rail World, Inc. et al.*, No. 13-cv-06193 (N.D. Ill), *Sophie Veilleux o/b/o Estate of Richard Veilleux v. Rail World, Inc. et al.*, No. 13-cv-06203 (N.D. Ill), *Georgette Martin o/b/o Estate of David Martin v. Rail World, Inc. et al.*, No. 13-cv-06199 (N.D. Ill), *Marie-Josee Grimard o/b/o Henriette Latulippe v. Rail World, Inc. et al.*, No. 13-cv-06197 (N.D. Ill), *Pascal Charest o/b/o Estate of Alyssa Charest Begnoche v. Rail World, Inc. et al.*, No. 13-cv-06263 (N.D. Ill), *Pascal Charest o/b/o Estate of Bianka Charest Begnoche v. Rail World, Inc. et al.*, No. 13-cv-06266 (N.D. Ill), *Elise Dubois-Couture o/b/o Estate of David LaCroix-Beaudoin v. Rail World, Inc. et al.*, No. 13-cv-06262 (N.D. Ill), *Gaston Begnoche o/b/o Estate of Talitha Coumi Begnoche v. Rail World, Inc. et al.*, No. 13-cv-06257 (N.D. Ill), *Louise Couture o/b/o Estate of Kathy Clusiault v. Rail World, Inc. et al.*, No. 13-cv-06264 (N.D. Ill), *Michel Boulanger o/b/o Estate of Eliane Parenteau v. Rail World, Inc. et al.*, No. 13-cv-06261 (N.D. Ill), and *Yann Proteau o/b/o Estate of Karine Champagne v. Rail World, Inc. et al.*, No. 13-cv-06258 (N.D. Ill).

filed by Western Petroleum Corporation and Petroleum Transport Services, Inc.,[2] (together, the "**Western Petroleum Defendants**"), request the same relief. (ECF Nos. 1 and 2). These motions are joined by the CIT Group, Inc. ("**CIT**"); Rail World, Inc., Rail World Locomotive Leasing, LLC, and Edward A. Burkhardt (together, the "**Rail World Defendants**"); and Dakota Petroleum Transport Solutions, LLC and DPTS Marketing, LLC (together, the "**Dakota Petroleum Defendants**") (ECF Nos. 3, 4, and 52). Collectively, the Defendants in the Illinois actions will be referred to as the "**Non-Debtor Defendants**." Also before the Court is a motion filed by the wrongful death claimants (the "**Claimants**") to strike certain exhibits filed by the Trustee, CIT, and the Rail World Defendants in support of transfer. (ECF No. 55).

For the reasons that follow, the Court **DENIES** the motion to strike and **GRANTS** the motions to transfer.

## BACKGROUND

### A. Procedural Background

On July 6, 2013, a train belonging to the Railway derailed in Lac Mégantic, Quebec, setting off massive explosions that destroyed part of downtown Lac Mégantic and killed 47 people. The Railway filed for bankruptcy in the District of Maine on August 7, 2013, and the Railway's Canadian subsidiary commenced a parallel proceeding under Canada's Companies' Creditors Arrangement Act. Twenty wrongful death cases arising out of the event were filed in Illinois state courts both

---

[2]      The defendant named in the tort suits was "Petroleum Transport Solutions, LLC." Petroleum Transport Services, Inc. was not named.

before and after the Railway filed for bankruptcy. Those that were filed before August 7, 2013, named the Railway as a defendant; those that were filed afterward did not name the Railway. All of the cases named the Rail World Defendants, the Dakota Petroleum Defendants,[3] and the Western Petroleum Defendants[4] as defendants, and seven of the cases also named CIT as a defendant.[5] After the Railway filed for bankruptcy, those that had named the Railway as a defendant dismissed the Railway from their suits without prejudice. One plaintiff dismissed her suit entirely, but the other nineteen plaintiffs retained their suits against defendants other than the Railway.

On August 29, 2013 and September 3, 2013, the Western Petroleum Defendants filed notices of removal with the United States District Court for the Northern District of Illinois, Eastern Division, in the remaining nineteen cases. One case was remanded to state court on September 12, 2013, on the basis that federal diversity jurisdiction was lacking. On September 19, 2013, the executive committee of the United States District Court for the Northern District of Illinois entered an order reassigning the 18 cases remaining on the federal docket to one judge within the district, finding that the cases were related to one another.[6] The

---

[3]     Also named in all complaints were the apparently related entities Dakota Plains Transloading, LLC and Dakota Plains Marketing, LLC. These entities have not entered appearances in this matter.

[4]     Also named in all complaints was the apparently related entity, World Fuel Services Corporation, which the Western Petroleum Defendants assert has not been properly served in the Illinois cases and thus has not entered an appearance in this matter.

[5]     These seven suits also named Union Tank Car Co., GATX Corporation, and Trinity Industries, Inc. as defendants. These entities have not entered appearances in this matter.

[6]     There was nothing in particular about the remanded case that set it apart factually or legally from the eighteen cases that remained on the federal docket. Rather, when the cases were removed to federal court, they were assigned to a number of different judges, and the plaintiff in the

court stayed these cases on November 20, 2013, pending this Court's resolution of the question whether these cases are related to the Railway's bankruptcy and thus transferrable under 28 U.S.C. §§ 157(b)(5) and 1334 to the United States District Court for the District of Maine.

### B. The Claims Against the Non-Debtor Defendants

The Claimants state substantially the same claims in all nineteen suits.[7] According to the complaints, a certain type of tank car (the "**DOT-111**"), which was transporting crude oil on the night of the Lac Mégantic disaster, is known to have problems with rupturing upon derailment. The train that derailed on the night of the Lac Mégantic disaster consisted of five locomotives and seventy-two DOT-111 tank cars operated by a lone engineer. On the night of the accident, the engineer parked the train in Nantes and left the train unattended to take a mandatory sleep break. A fire on one of the locomotives caused the locomotive to be powered down, which caused the train's air-brake system to lose power. When the brake block eventually released, the train began rolling down the tracks in the direction of Lac Mégantic. The DOT-111s began derailing, rupturing and spilling an estimated 1.5 million gallons of crude oil. Some of the oil ignited and exploded, causing massive

---

remanded case promptly brought a motion to remand that case to state court, which the court granted on the basis that diversity jurisdiction was lacking. The defendants also asserted that the federal district court had jurisdiction of the case under 28 U.S.C. §1334 as a case related to the Railway's bankruptcy, but the court determined that bankruptcy-relatedness jurisdiction was for this Court to determine.

[7] The Court culls its summary from WFS Entities' Reply in Support of Transfer Ex. 2 (ECF No. 51-2) (Complaint, *Michel Boulanger as Special Administrator of the Estate of Elaine Parenteau v. Rail World, Inc. et al.*, no. unspecified (Cir. Ct. Ill., Aug. 14, 2013)). The allegations in this complaint are unproven and are recited solely for the purpose of outlining the nature of the claims against the Non-Debtor Defendants. Counsel for the Western Petroleum Defendants represented that all of the complaints contain substantially the same allegations. January 31, 2014 Hr'g Tr. 8 (ECF No. 89). The Court also recognizes that not all complaints name the exact same defendants.

property damage and the deaths of 47 individuals. The rest of the oil polluted the environs of the disaster.

Rail World is alleged to be not only the Railway's parent corporation, but also its management company. Edward Burkhardt, Rail World's president and CEO, is also alleged to have been chairman of the Railway. Rail World and Burkhardt are alleged to have made management decisions regarding operation of the Railway, including reducing crew sizes on the Railway's freight trains, which led to the accident. Rail World Locomotive Leasing is alleged to have leased locomotives to the Railway that it knew were obsolete and prone to catching fire. The Rail World Defendants are all alleged to reside in or have corporate offices in Illinois. The Western Petroleum Defendants are alleged to have owned the crude oil involved in the disaster, and the Dakota Petroleum Defendants are alleged to have arranged for its transport on the Railway despite having notice of the Railway's poor safety record. CIT is alleged to have manufactured and owned several of the DOT-111s involved in the disaster.[8] The complaint states product liability claims against CIT.

### C. Post-Filing Developments

Facts relevant to the motions to transfer have developed since the Trustee's motion was first filed on September 11, 2013. On January 31, 2014, the Court held a hearing on the motions to transfer. The Trustee estimates that, since the Railway filed for bankruptcy, creditors have made somewhere between $34 million and $40 million in secured claims against the Estate. January 31, 2014 Hr'g Tr. 10. The

---

[8]     Union Tank Car Co., GATX Corporation, and Trinity Industries, Inc., who are defendants in several of the cases but who have not appeared before this Court, are also alleged to be manufacturers of DOT-111s that were involved in the disaster.

Trustee also mentioned, although it is unclear whether these will be secured claims or administrative expenses, that environmental remediation at the site of the disaster may cost from $200 million to $500 million or more. January 31, 2014 Hr'g Tr. 11.

On January 23, 2014, the Bankruptcy Court approved a sale of most of the Railway's physical assets for $14,250,000. The Trustee estimates that the remaining physical assets in the Estate, also pledged to secured creditors, are worth $1.6 million. January 31, 2014 Hr'g Tr. 12-13. Although this liquidates the physical assets of the Estate, the Trustee claims that the Estate has additional, intangible assets that will be available to unsecured creditors. Most significant are a $25 million liability insurance policy (the "**XL Policy**"), and the Estate's claims against Western Petroleum and the other defendants for the part allegedly played by these entities in the disaster. January 31, 2014 Hr'g Tr. 17, 19, 21.

### D. The Estate's Claims Against Non-Debtor Defendants

On January 30, 2014, the Trustee filed a complaint against Western Petroleum Company, World Fuel Services Corporation, and World Fuel Services, Inc.[9] This complaint asserts that World Fuel Services, Inc. produced, from the Bakken Formation in North Dakota, the crude oil that was being transported on the

---

[9] A copy of this complaint (the "**MMA Complaint**") was provided to the Court by the Western Petroleum Defendants as Exhibit 1 at the January 31, 2014 hearing. It was filed with the Bankruptcy Court in MMA's bankruptcy, Bk. No. 13-10670 (Bkr. D. Me.) on January 30, 2014. (ECF No. 605). As with the Claimants' complaint, the allegations in this complaint are unproven and are summarized by the Court for the sole purpose of outlining the nature of the Railway's claims against these defendants.

night of the disaster and that the three defendants together arranged for transport of the oil.

The complaint alleges that these defendants had a duty to classify the volatility of the oil for purposes of its transport and that they misclassified the oil as a high flash-point, low volatility substance when it actually "had a dangerously low flash point and was highly volatile." MMA Complaint ¶ 7. The complaint further alleges that these defendants knew or should have known that, given the volatility of the oil, the unreinforced tank cars used for its transport were unsuitable. The complaint also alleges that, had the oil been properly classified, the Railway could have taken steps that would have avoided the derailment.

As injuries, the Trustee asserts the destruction of the Railway's business and its costs of defending against and "risk of significant liabilities with respect to" the Claimants' claims, claims made in a class-action lawsuit filed in Canada, and environmental clean-up claims. MMA Complaint ¶ 104. The Trustee believes that its claims against these non-debtor defendants are worth hundreds of millions of dollars. January 31, 2014 Hr'g Tr. 21.

### E. The Claimants' Motion to Strike

The Claimants have asked the Court to strike several exhibits filed by the Trustee, CIT, and the Rail World Defendants with their reply briefs. The Court addresses the motion to strike first, as it determines in part the information the Court will use to determine bankruptcy-relatedness.

In their motions to transfer, the Movants claimed that the Non-Debtor Defendants have rights of indemnification against and shared insurance with the Railway, but none of the Movants attached documents to support these claims. The Claimants responded that the Court should deny the motions to transfer in part because the Movants had failed to provide any evidence of shared insurance or indemnification rights that might affect the estate. In reply, the Movants attached a number of documents purporting to establish the shared insurance and indemnification obligations of the Railway to some of the Non-Debtor Defendants. The Claimants have moved to strike these exhibits.

At bottom, these documents are probative of the question of bankruptcy-relatedness, and they should be considered on the motions to transfer. The Claimants took the opportunity in their motion to strike to set forth their arguments against both the relevance and the evidentiary quality of these documents. This cures any prejudice otherwise created by the Movants' failure to attach the documents to their original motions. Accordingly, the Claimants' motion to strike is denied.

## LEGAL STANDARD

United States district courts have "original but not exclusive jurisdiction of all civil proceedings . . . arising in or related to cases under" the Bankruptcy Code. 28 U.S.C. § 1334. By statute, district courts are permitted to refer bankruptcy matters to bankruptcy judges, which this district does by standing rule.[10]

---

[10] The District of Maine has made a blanket referral of bankruptcy matters to the bankruptcy judges. *See* 28 U.S.C. § 157(a), (allowing district courts to refer "any and all cases under title 11 and

The grant of "related to" jurisdiction "is quite broad." *In re Boston Reg'l Med. Ctr., Inc.*, 410 F.3d 100, 105 (1st Cir. 2005). It was intended to allow bankruptcy courts to "'deal efficiently and expeditiously with all matters connected with the bankruptcy estate.'" *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) (quoting *Pacor Inc. v. Higgins*, 743 F.2d 984, 994 (3rd Cir. 1984), overruled in part on other grounds by *Things Remembered, Inc. v. Petrarca*, 516 U.S. 124, 124–25 (1995)).

> One of the central purposes—perhaps *the* central purpose—of extending bankruptcy jurisdiction to actions against certain third parties, as well as suits against debtors themselves, is to 'protect[ ] the assets of the estate' so as to ensure a fair distribution of those assets at a later point in time.

*In re Quigley Co., Inc.*, 676 F.3d 45, 57 (2d Cir. 2012) (emphasis in original) (quoting *In re Zarnel*, 619 F.3d 156, 171 (2d Cir. 2010) (alteration in original)).

Thus, bankruptcy jurisdiction over a third-party non-debtor claim is appropriate if "the outcome of the litigation 'potentially [could] have some effect on the bankruptcy estate, such as altering debtor's rights, liabilities, options, or freedom of action, or otherwise have an impact upon the handling and administration of the bankruptcy estate." *In re Boston Reg'l,* 410 F.3d at 105 (quoting *In re G.S.F. Corp.*, 938 F.2d 1467, 1475 (1st Cir. 1991), abrogated in part on other grounds by *Connecticut Nat'l Bank v. Germain*, 503 U.S. 247 (1992)) (alteration in original); *see also Pacor*, 743 F.2d at 995 ("[A] civil proceeding is

---

any or all proceedings arising under title 11 or arising in or related to a case under title 11" to bankruptcy judges in the district.); D. Me. Loc. R. 83.6(a) ("All cases under Title 11 and all civil proceedings arising under Title 11 or arising in or related to cases under Title 11 are referred to the bankruptcy judges of this district pursuant to 28 U.S.C. Section 157(a)).")

related to bankruptcy [if] the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.").

Bankruptcy relatedness jurisdiction, however, "is not unlimited." *In re Santa Clara Cnty. Child Care Consortium*, 223 B.R. 40, 45 (B.A.P. 1st Cir. 1998), *see also TD Bank, N.A. v. Sewall*, 419 B.R. 103 (D. Me. 2009) ("a case is not "related to" a bankruptcy case simply because it shares facts with a [bankruptcy] proceeding." (citing *Pacor*, 743 F.2d at 995)). "There must be some nexus between the 'related proceeding' and the title 11 case" to establish relatedness jurisdiction. *In re Santa Clara Cnty.*, 223 B.R. at 45.

The determination of relatedness is specific to the facts of the cases at issue. *See In re Boston Reg'l,* 410 F.3d at 107 ("what is 'related to' a proceeding under title 11 in one context may be unrelated in another"). The burden of demonstrating relatedness rests with the parties seeking to transfer the wrongful death cases to this Court. *See Amoche v. Guarantee Trust Life Ins. Co.*, 556 F.3d 41, 48 (1st Cir. 2009) (citing, in a Class Action Fairness Act case, the "basic principle" that the "party invoking federal jurisdiction has the burden of establishing that the court has subject matter jurisdiction over the case"); *see also, e.g., Meritage Homes Corp. v. JPMorgan Chase Bank, N.A.*, 474 B.R. 526, 555 (Bankr. S.D. Ohio 2012).

If the Movants can establish that the wrongful death cases are "related to" the bankruptcy, then Section 157(b)(5) provides that this Court must determine the appropriate venue. Specifically, the statute provides:

> [t]he district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the

bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case in pending.

28 U.S.C. § 157(b)(5). Because the claims arose in Canada, if this Court finds bankruptcy relatedness jurisdiction, it could transfer the cases only to the District of Maine.

## DISCUSSION

The Movants contend that the wrongful death cases are related to the Railway's bankruptcy and thus must be transferred to and tried in this district. The Movants assert four grounds for bankruptcy-relatedness jurisdiction. First, they claim that the Non-Debtor Defendants have claims for indemnity against the Railway such that recovery by the Claimants against the Non-Debtor Defendants would cause the Non-Debtor Defendants to seek repayment from the Estate. Second, CIT, Rail World, Rail World Locomotive Leasing, and Edward Burkhardt assert that claims against them are related to the Railway's bankruptcy because they share liability insurance with the Railway that is applicable to claims arising out of the disaster. Third, the Western Petroleum Defendants claim that resolution of the wrongful death suits may lead to a windfall for the Claimants if their cases are not consolidated and transferred to Maine. Finally, the Movants assert that centralization of the cases in the District of Maine will alleviate the burden on the Estate of duplicative discovery.[11]

---

[11]     The Official Committee of Victims, appointed by the Bankruptcy Court to represent the interests of all victims of the Lac Mégantic disaster, including the governments of Quebec and Lac Mégantic as well as individual victims, appeared at the January 31, 2014 hearing. The Committee stated that it supports the Trustee's motion to transfer, but only to the extent the Claimants file

The Claimants assert that the Non-Debtor Defendants' claims against the Railway do not suffice to create bankruptcy-relatedness jurisdiction. They argue that there will be no possibility of recovery by the Non-Debtor Defendants against the Estate because the Estate is facing hundreds of millions of dollars in liability. Because the Non-Debtor Defendants cannot possibly recover against the Estate, their claims cannot affect the Estate.

## I. "Related to" Bankruptcy Jurisdiction

### A. Indemnification

#### 1. The Governing Standard

The Movants first assert that the wrongful death suits are related to the Railway's bankruptcy because the Non-Debtor Defendants have indemnification claims against the Railway. The Trustee characterizes these as "immediately cognizable claims for indemnity that are active right now," though he does not concede that the Railway must indemnify any of the Non-Debtor Defendants. January 31, 2014 Hr'g Tr. 30. The Claimants assert that the wrongful death suits are not related to the Railway's bankruptcy because the Trustee disputes the Railway's obligation to indemnify the Non-Debtor Defendants.[12]

proofs of claim in the bankruptcy. January 31, 2014 Hr'g Tr. 50-51. The Court views this, not as a legal argument, but as a matter of fact, i.e., to the extent consent is an issue, the Court has the consent of this committee to the transfer of any cases brought by victims who have filed proofs of claim in the Railway's bankruptcy.

[12] Courts have found bankruptcy-relatedness jurisdiction where the debtor does not dispute the non-debtor defendant's right to indemnification. *See A.H. Robins v. Piccinin*, 788 F.2d 994, 1008 (4th Cir. 1986) (upholding a bankruptcy stay of litigation against non-debtor defendants whose "rights . . . to indemnity . . . are undisputed on the record"). In such cases, the potential impact on the bankruptcy estate is the same as in cases where indemnification arises "automatically" because there is no need for the indemnitee to prove its claim against the debtor.

Although courts generally agree on the relatedness test—"[a]n action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action"[13]—they diverge in the application of that test when it comes to indemnification claims. The Third Circuit holds that indemnification claims do not have any potential to affect a bankruptcy if the indemnitee must bring its own lawsuit against the debtor to enforce its rights. *See In re W.R. Grace & Co.*, 591 F.3d 164, 173 (3d Cir. 2002) ("we have stated and restated that, in order for a bankruptcy court to have related-to jurisdiction to enjoin a lawsuit, that lawsuit must 'affect the bankruptcy [ ] without the intervention of yet another lawsuit.'" (quoting *In re Federal-Mogul Global, Inc.*, 300 F.3d 368, 382 (3d Cir. 2002)); *see also A.H. Robins Co., Inc.,* 788 F.2d at 999 (bankruptcy court has jurisdiction to stay a case against a non-debtor if the non-debtor "is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case").

The Sixth Circuit has a more expansive view of the potential of non-debtor lawsuits to affect the administration of a bankruptcy estate. In *In re Dow Corning Corp.*, mass tort litigation arose over silicone breast implants manufactured by Dow Corning. *In re Dow Corning Corp.*, 86 F.3d 482, 485 (6th Cir. 1996). Tens of thousands of implant recipients sued Dow Corning along with suppliers of Dow Corning's implants and other manufacturers that used Dow Corning's silicone in their own implants. *Id.* Dow Corning entered Chapter 11 bankruptcy and moved to transfer tort suits against it to the federal district court where its bankruptcy was

---

[13]     *Celotex*, 514 U.S. at 308 n. 6 (quoting *Pacor*, 743 F.2d at 994).

proceeding. *Id.* at 486. The other manufacturers and distributors also requested transfer to the district. *Id.* The district court refused to transfer the latter cases, but the Sixth Circuit reversed, holding that because the claims against the other manufacturers and distributors "could ripen into fixed claims" against Dow Corning, the cases against the non-debtor defendants were related to the bankruptcy. *Id.* at 494. In support of this holding, and to distinguish the Third Circuit's holding in *Pacor*, the Sixth Circuit observed that "[a] single possible claim for indemnification or contribution simply does not represent the same kind of threat to a debtor's reorganization plan as that posed by the thousands of potential indemnification claims at issue here." *Id.* The Sixth Circuit also noted the close relationship between Dow Corning and the non-debtor defendants and the fact that their liability stemmed from "joint conduct." *Id.* at 492.

The First Circuit has not yet determined whether a lawsuit against a non-debtor defendant with a disputed indemnity claim against the debtor has the potential to affect the bankruptcy estate. *See In Re New England Compounding Pharm., Inc. Prods. Liab. Litig.*, 496 B.R. 256, 268 (D. Mass 2013) (noting this "open question" and reviewing cases). Courts in the District of Maine have stayed true to the Third Circuit's reasoning. A lawsuit against a defendant who has an unconditional right to indemnification from the debtor has the potential to affect distributions to unsecured creditors in a debtor's bankruptcy. *See Sewall,* 419 B.R. at 106-07 ("If the indemnification argument were all that the [defendants] had here, I would deny their Motion to Transfer because . . . [they] have not shown that the

company/debtor is under an unconditional duty to indemnify them."); *Philippe v. Shape, Inc.*, 103 B.R. 355, 358 (D. Me. 1987) (relatedness jurisdiction found where debtor's by-laws provided for unconditional indemnification of its officers, judgment against debtor's officers "would automatically result in indemnification liability" for the debtor, and "some part of the estate otherwise owing to existing creditors would be susceptible to being diverted to meet this indemnity obligation"). A lawsuit against a defendant who has a conditional right to indemnification from the debtor has not been considered related to the bankruptcy. *Central Maine Rest. Supply v. Omni Hotels Mgmt. Corp.*, 73 B.R. 1018, 1023-24 (D. Me. 1987) (no bankruptcy-relatedness jurisdiction over non-debtor lawsuit because non-debtor defendant's contractual right to indemnification from debtor was subject to a number of conditions that rendered the right to indemnification uncertain).

The Trustee asks the Court to follow a recent decision of the District of Massachusetts wherein the court exercised bankruptcy-relatedness jurisdiction over lawsuits against non-debtors that allegedly distributed or administered contaminated injectable steroids manufactured by the debtor. *See New England Compounding Pharm.*, 496 B.R. at 269. The district court judge followed the "more pragmatic" approach of the Sixth Circuit in *Dow Corning. Id.* at 268-69. *See also In re Twinlabs Personal Injury Cases*, No. 03 Civ. 9169, 2004 WL 435083, *1 (S.D.N.Y. March 8, 2004) (finding lawsuit against retailer of debtor's product was related to debtor's bankruptcy). There may be good reason for an expansive test in the products liability context. When an injured party sues the distributor of a defective

product, this gives rise to a common-law indemnity claim by the distributor against the manufacturer based on the manufacturer's primary liability for the defective product.[14] The distributor's liability is derivative of the manufacturer's liability, and thus any finding of liability against the distributor requires a finding that the debtor's product is defective. Even though such findings are not binding on the debtor, courts have recognized that such judgments and resulting indemnity claims will inevitably affect a debtor-manufacturer's bankruptcy. *See Dow Corning*, 86 F.3d at 492-94 (noting the "close relation" between Dow Corning and the non-debtor defendants and commenting that the possibility of contribution or indemnification was "far from attenuated"); *New England Compounding Pharm.*, 496 B.R. at 262 & 269 (describing non-debtor defendants as debtor's affiliates).

This case is different. Here, the liability of the Non-Debtor Defendants is not necessarily derivative of any primary liability of the Debtor. Indeed, the Trustee has asserted that the Western Petroleum Defendants are primarily liable for the disaster for failing to disclose the volatility of the oil to the Railway. CIT's liability arises out of the purportedly defective design of the DOT-111 tank cars it leased to the Railway. This is also independent of the Railway's alleged liability. The Rail World Defendants, as managers, have a closer relationship to the Railway. But whereas a products-liability judgment against a retailer points directly to the

---

[14]    *See* 42 C.J.S. Indemnity § 49, which states in part that "liability stemming from a defective product is subject to a common law, implied right to indemnity on the part of a member of the product's marketing chain, such as a broker or retailer, against one higher in the chain of distribution, and particularly against a manufacturer, who bears the primary responsibility of putting a defective product into the stream of trade." (footnotes omitted).

liability of the debtor-manufacturer, a judgment against the Rail World Defendants as negligent managers of the Railway does not necessarily implicate the Railway.

Under these circumstances, the Court sees no reason to stray from the rule articulated in *Omni* and *Sewall*, namely, that when the non-debtor defendant's right to indemnification from the debtor is uncertain or conditional, the cases giving rise to the indemnification claims are not related to the debtor's bankruptcy. *See Sewall*, 419 B.R. at 106-07 (citing *Omni*, 73 B.R. at 1024).

### 2. Application of the *Omni/Sewall* Indemnification-Relatedness Rule to the Non-Debtor Defendants

The Court reviews the evidence of indemnification offered by the Non-Debtor Defendants to determine whether any of these defendants have established unconditional indemnification rights giving rise to bankruptcy-relatedness.

#### i. The Western Petroleum and Dakota Petroleum Defendants

Neither the Western Petroleum Defendants nor the Dakota Petroleum Defendants have provided any evidence that they are entitled to indemnification from the Railway. The Western Petroleum Defendants assert, instead, that because their liability arises out of the same disaster that drove the Railway into bankruptcy, and because they have filed proofs of claim in the Railway's bankruptcy,[15] the potential for indemnification, and thus the potential effect on the

---

[15] To establish bankruptcy-relatedness, it may be *necessary* for a non-debtor defendant to file a proof of claim in the debtor's bankruptcy, but this alone is not sufficient to create bankruptcy-relatedness. *See, e.g., New England Compounding Pharmacy*, 496 B.R. at 270 (noting that any non-debtor defendant who did not file a claim in the debtor's bankruptcy by the claims bar date would be prevented thereafter from claiming indemnity against the debtor, and the court would not exercise jurisdiction over cases against such defendants).

bankruptcy, is "manifest." WFS Entities' Reply in Supp. of Transfer 2 (ECF No. 51). Under the test applicable to this case, this conclusory argument fails.

The Western Petroleum Defendants also assert contribution and subrogation rights against the Railway, but have provided no evidence of unconditional rights of contribution or subrogation. Accordingly, these claimed rights also fail to establish a potential to affect the Railway's bankruptcy.

## ii. The Rail World Defendants

Among its reply exhibits, the Trustee attached excerpts of a January 8, 2003 management agreement between Rail World and the Railway that provided in part that the Railway would indemnify Rail World against any liability that may result from Rail World's performance of its duties under the management agreement, except to the extent Rail World's liability was a result of "gross negligence, willful misconduct or bad faith."[16] The Trustee also attached undated excerpts from the Railway's bylaws providing that directors and officers of the company are entitled to indemnification by the Railway for actions or omissions taken in their capacities as directors and officers, except to the extent their actions were criminal or in bad faith. The bylaws state that a director or officer denied indemnification by the company may enforce his right to indemnification "in any court of competent jurisdiction."[17] While these indemnification claims are supported by some contractual language, they are limited and qualified, and the Railway has not admitted a duty to indemnify either Rail World or Burkhardt. Rail World and

---

[16]     Trustee's Reply Mem. in Supp. of Transfer Ex. B, § 8 (ECF No. 46-2).
[17]     Trustee's Reply Mem. in Supp. of Transfer Ex. C, Art. IX. (ECF No. 46-3)

Burkhardt will need to engage in separate litigation against the Railway to establish their rights to indemnification. They have thus failed to establish unconditional indemnification rights. *See Omni*, 73 B.R. at 1023-24 ("[T]he indemnification provision is subject to a number of conditions that render [the non-debtor defendant's] right to indemnification uncertain.").

Supplementing the Trustee's exhibits, the Rail World Defendants filed on their own behalf a "railroad locomotive lease agreement" between Rail World Locomotive Leasing ("**RWLL**") and the Railway dated July 1, 2012. (ECF No. 53-1). Paragraph 4 of this agreement contains a disclaimer of liability by RWLL for any defects in rail cars leased by the Railway from RWLL. In addition, under paragraph 8, the Railway waives any right to make claims against RWLL and

> assumes and agrees to release, acquit, waive any rights against and forever discharge [RWLL] . . . from and against any and all claims, demands or liabilities imposed upon them by law or otherwise of every kind, nature and character on account of personal injuries, including death, at any time resulting from and on account of damage to or destruction of the Locomotive(s) or their operation or use, arising from any incident which may occur to or be incurred by the [Railway] . . . in conjunction with the use or possession of the Locomotive(s) or their operation or use, whether or not caused or arising out of the acts, or omissions, other than those that are intentional, or negligence, except those of gross negligence of [RWLL], its directors, administrators, officers, employees, agents, successors and assigns or any other cause or causes.
>
> The [Railway] further agrees to defend [RWLL] . . . against any claims, suits, actions or proceedings filed against any of them with respect to the subject matter of this indemnity provision . . . .
>
> (ECF No. 53-1 ¶ 8).

This rather dense, self-described "indemnity provision" does not appear to establish an unconditional right to indemnity from the Railway, and the Trustee has not conceded a duty to indemnify RWLL. Accordingly, Rail World Defendants have failed to establish a potential to affect the Railway's bankruptcy under the *Omni/Sewall* test.

### iii. CIT

CIT claims that it has a contractual right to indemnification from the Railway. CIT attached a March 18, 2013 "master net locomotive lease" it executed with the Railway providing that the Railway would defend and indemnify CIT against any claims arising out of the Railway's use of the leased units. Master Lease § 13 (ECF No. 50-2). Section 13 of the Master Lease states in pertinent part:

> Lessee [the Railway] agrees to defend, indemnify and hold Lessor [CIT] and its affiliates, and their respective, authorized representatives, directors, officers, employees, successors and assigns harmless from and against any claim (including without limitation relating to environmental matters) of whatsoever nature and regardless of the cause thereof arising out of, or in connection with or resulting from: . . . (iv) the occurrence of any event or circumstance described in Section 14A, [listing, inter alia, "any liability, claim, loss, damage or expense of any kind or nature caused, directly or indirectly, by any unit or any inadequacy thereof"], including, without limitation, any claim based upon doctrines of product liability or strict or absolute liability in tort or imposed by statute . . . .

The Claimants state product liability claims against CIT as the manufacturer and owner of DOT-111s involved in the disaster. The Master Lease requires the Railway to indemnify CIT against these claims. Neither the Trustee nor the Claimants argue that this contractual indemnification obligation is in any respect less than absolute. On the evidence presented, the Court concludes that CIT has established

an unconditional right to indemnification from the Railway, and thus, that claims against it are related to the Railway's bankruptcy. *See Shape, Inc.*, 103 B.R. at 358.

## B. Shared Insurance

Claims against non-debtor defendants who share a policy of insurance with the debtor are related to the debtor's bankruptcy. *See Quigley*, 676 F.3d at 54 (the debtor's liability insurance is property of the bankruptcy estate, and any lawsuits against a defendant covered by the same insurance directly affects the bankruptcy estate); *A.H. Robins*, 788 F.2d at 1001 (actions are related to a bankruptcy whenever they involve claims against an additional insured under the debtor's liability insurance policy).

The Railway has one $25 million policy of insurance—the XL Policy—available to satisfy the Claimants' claims. This is insufficient to meet the needs of all those who have been injured. Any lawsuits against defendants that are also insured under this policy threaten to further diminish the coverage under this policy. It would be unfair to allow judgments against non-debtor defendants to claim any portion of the policy proceeds out of proportion to the claims of others. *See Quigley,* 676 F.3d at 53-54*; A.H. Robins,* 788 F.2d at 1001.

Following oral argument, counsel for the Rail World Defendants submitted a copy of the XL Policy (ECF No. 86-1), which reveals that Burkhardt, Rail World, and Rail World Locomotive Leasing are co-insureds with the Railway under this policy. *See* XL Policy at 9 (Endorsement #004, listing "Rail World, Inc." as a named insured and providing coverage for directors and officers of any named insured, *i.e.*,

Burkhardt), 33 (Endorsement #006, listing "Rail World Locomotive Leasing LLC" as an additional insured). The Claimants do not contest this coverage.

CIT has also provided sufficient evidence of its status as an insured under the XL Policy. The Master Lease provides that the Railway must maintain commercial general liability insurance of at least $10 million per occurrence and that such policy must name CIT as an additional insured. Master Lease § 7. CIT also attached a certificate of insurance for the XL Policy covering the period April 1, 2013 through April 1, 2014, and naming CIT as an additional insured. Insurance Certificate (ECF No. 50-3).

Given the evidence of shared insurance, the Court finds that the nineteen wrongful death suits, all of which name the Rail World Defendants, and seven of which name CIT, are related to the Railway's bankruptcy.

### C. Prevention of a Windfall

The Western Petroleum Defendants argue that consolidation of the wrongful death suits in this Court is necessary to prevent the Claimants from receiving a windfall or double-recovery in the Railway's bankruptcy. The Court fails to see how this would be possible. If a claimant receives satisfaction of her claim from a non-debtor defendant prior to distribution of estate, she would have to amend her proof of claim to reflect that she no longer has a claim against the estate.[18] By the same token, should the claimant receive a distribution from the bankruptcy estate prior

---

[18] *See* Instructions ¶ 6 on Proof of Claim form B10 ("An authorized signature on this proof of claim serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt."). The Bankruptcy Court's online filing system provides a mechanism for amending a proof of claim to reflect a change in the amount claimed.

to any recovery in the non-debtor lawsuit, her total recovery in that suit will be reduced by the amount she received from the bankruptcy estate. *See, e.g.*, *Thornton v. Garcini*, 928 N.E.2d 804, 811 (2010) ("A plaintiff may, however, receive only one full compensation for his or her injuries, and double recovery for the same injury is not allowed."). Either way, there is no possibility of a windfall or double-recovery.

The Western Petroleum Defendants cite several cases that held that lawsuits against non-debtor defendants that may reduce the estate's liability were related to the debtor's bankruptcy, including *In re Canion*, 196 F.3d 579, 586-87 (5th Cir. 1999); *CPC Livestock, LLC v. Fifth Third Bank, Inc.*, 495 B.R. 332 (W.D. Ky. 2013); *Omega Tool Corp. v. Alix Partners, LLP*, 416 B.R. 315, 320 (E.D. Mich. 2009). These cases involved trade creditors suing non-debtor defendants for fraud that either induced the creditors to extend unrecoverable credit to the debtor or that depleted the debtor's assets, and they are inapplicable to this case.

### D.     Convenience/Economy

The Trustee also argues that the Court should find that the wrongful death suits are related to the Railway's bankruptcy because transferring these suits to this Court will conserve valuable Estate resources by consolidating discovery and motion practice in one forum. There are two flaws with this argument.

First, the Railway is not a party to, and thus is not bound by any judgments that may arise out of the non-debtor lawsuits. This raises the question whether the Railway's resources need be expended at all in discovery or motion practice related to these lawsuits. *See Pacor*, 743 F.2d at 995 ("[T]he outcome of the *Higgins-Pacor*

action would in no way bind Manville [the debtor], in that it could not determine any rights, liabilities, or course of action of the debtor. Since Manville is not a party to the *Higgins-Pacor* action, it could not be bound by res judicata or collateral estoppel." (internal citations omitted)). Second, even if the Railway was compelled or otherwise felt it necessary to participate in the non-debtor lawsuits, convenience and economy alone are not enough to confer bankruptcy-relatedness jurisdiction. *See Pacor*, 743 F.2d at 994 ("[T]he mere fact that there may be common issues of fact between a civil proceeding and a controversy involving the bankruptcy estate does not bring the matter within the scope of [bankruptcy-relatedness]. Judicial economy itself does not justify federal jurisdiction." (internal citations omitted)). For these reasons, the Trustee's convenience and economy arguments are unavailing.

## II.    Abstention

At oral argument, the Claimants requested that the Court exercise its discretion to abstain from exercising bankruptcy-relatedness jurisdiction.[19] January 31, 2014 Hr'g Tr. 98-99. Under 28 U.S.C. § 1334(c)(1), a district court has the right to abstain from exercising its jurisdiction over proceedings related to a bankruptcy case. 28 U.S.C. § 1334(c)(1).

Courts consider a number of factors in deciding whether to exercise discretionary abstention, among them:

> (1) the effect on the efficient administration of the estate, (2) the extent
> to which state law issues predominate over bankruptcy issues, (3) the

---

[19]    Congress also requires courts to abstain from exercising bankruptcy-relatedness jurisdiction under certain circumstances. *See* 28 U.S.C. § 1334(c)(2). The Claimants have broadly hinted that, should the Court find jurisdiction of their cases, they will be seeking mandatory abstention.

difficulties or unsettled nature of the applicable law, (4) the presence of a related proceeding in state court; (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334; (6) the relatedness of the proceeding to the main bankruptcy case; (7) the substance, and not the form, of the alleged core proceeding; (8) the feasibility of severing state law issues from bankruptcy matters; (9) the burden on the docket of the bankruptcy court; (10) the likelihood that commencement of the bankruptcy proceeding amounted to forum shopping; (11) the existence of a right to jury trial; and (12) the presence in the proceeding of non-debtor parties.

*In re Unanue-Casal*, 164 B.R. 216, 222 (D.P.R. 1993) *aff'd sub nom. Goya Foods, Inc. v. Unanue-Casal*, 32 F.3d 561 (1st Cir. 1994).

Several factors weigh in favor of exercising jurisdiction.[20] The judicial economy and efficiency concerns articulated by the Trustee, though insufficient to create bankruptcy-relatedness jurisdiction, do weigh in the determination to retain jurisdiction. As part of the core bankruptcy proceedings, the Trustee will pursue the Railway's claims against the Non-Debtor Defendants, claims which have many facts and law in common with the wrongful death suits. To the extent parallel discovery is proceeding in the wrongful death suits, the Trustee and the Claimants may achieve some economy by litigating these suits in the same jurisdiction (*e.g.*, arranging for witness depositions to be attended by all interested parties). Although the wrongful death suits solely involve non-debtor parties, both CIT and the Rail

---

[20]     Many factors are either inapplicable to this case or are neutral. The burden on the bankruptcy docket and the right to a jury trial are inapplicable to this case because this Court, and not the Bankruptcy Court, will be adjudicating the wrongful death suits. Because personal injury and wrongful death claims are almost always governed by state law, "the predominance of state law issues" cannot "be given decisive effect in analyzing transfer under § 157(b)(5)." *In re Twin Labs., Inc.*, 300 B.R. 836, 841 (S.D.N.Y. 2003). The Claimants have also "not identified any unique or unsettled issues of state law that warrant abstention based on comity concerns." *In Re WorldCom, Inc. Secs. Litig.*, 293 B.R. 308, 332 (S.D.N.Y. 2003). Finally, there is no likelihood that the commencement of the bankruptcy in Maine constituted forum shopping. The Railway's bankruptcy was inevitable from the moment of the disaster, and it was filed in the jurisdiction where the Railway is headquartered.

World Defendants are related to the Railway through shared insurance, and in CIT's case, also through the Railway's unconditional obligation to indemnify CIT. This both creates bankruptcy-relatedness and stands as a reason for the Court to exercise jurisdiction.

Although there may be no basis for federal jurisdiction other than bankruptcy relatedness, and although this factor carries significant weight, it is not enough to persuade the Court that it should abstain from exercising its jurisdiction. Generally speaking, "federal courts have a 'virtually unflagging obligation . . . to exercise the jurisdiction given them, and may abstain only for a few 'extraordinary and narrow exception[s].'" *WorldCom*, 293 B.R. at 331 (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 and 817 (1976)). Accordingly, the Court declines to exercise its abstention discretion, and accepts jurisdiction of the Illinois wrongful death suits.

## CONCLUSION

For the above-stated reasons, the Court **DENIES** the Claimants' motion to strike and **GRANTS** the motions to transfer to this Court the nineteen wrongful death suits filed in Illinois, which are listed in footnote 1 of this opinion. Transfer of these *cases* is based on the Court's limited finding that claims against certain of the *defendants* named therein are related to the Railway's bankruptcy. The Court exercises pendent jurisdiction of all claims against all defendants in these cases

without prejudice to any rights the Claimants may have to sever claims that are unrelated to the Railway's bankruptcy.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 21st day of March, 2014.